**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**MONICA POMPEO,**

               **Plaintiff,**

**v.**                                            **CIV 13-0833 MCA/ACT**

**BOARD OF REGENTS OF**
**THE UNIVERSITY OF NEW MEXICO**
**CAROLINE HINKLEY, in her individual**
**capacity, and SUSAN DEVER, in her**
**individual capacity,**

               **Defendants.**

**RESPONSE TO MOTION TO DISMISS**

      Plaintiff Monica Pompeo, by and through her attorneys of record, Louren Oliveros,

Robert J. Gorence and Andrea D. Harris, of Gorence & Oliveros, P.C., hereby submits her

Response to Defendants' Motion to Dismiss [Doc. 5], and requests that the Court deny the

motion in its entirety.

**I.**      **Preliminary Statement**

      Defendants' Motion to Dismiss should be denied because the motion is now moot.  In

accordance with Tenth Circuit law, and because a responsive pleading has not yet been filed in

this case, Plaintiff has filed her First Amended Complaint. *See* Doc. 11.  While the original

complaint was not subject to dismissal, the First Amended Complaint cured all of the assertions

set forth by Defendants' motion.  Thus, the motion is now moot and should be denied.  If the

Court determines that the Defendants' motion is still ripe for decision, the motion should be

denied because Plaintiff enjoyed a First Amendment right inside a university classroom, and that

right was trampled upon when she was expelled from a University of New Mexico ("UNM")
class because of her classroom speech.

In their Motion, Defendants assert that Defendants Hinkley and Dever are entitled to
qualified immunity because there is no First Amendment right inside a classroom, *see* Doc. 5, p.
1, a claim that disregards unambiguous law that public school students, and in this case, the
students at the University of New Mexico, do not shed their constitutional right to freedom of
speech or expression once they enter a classroom.

Here, Defendants refused to grade Ms. Pompeo's critique of the film, *Desert Hearts*, and
told Ms. Pompeo not to return to her Images of Women course at the University of New Mexico
solely because they sought to stifle Ms. Pompeo's speech as represented in her paper.
Defendants' actions are prohibited by the First Amendment to the United States Constitution.

Ms. Pompeo's critique of the film, *Desert Hearts*, was submitted in direct response to the
assignment given to her by Defendant Caroline Hinkley ("Professor Hinkley"), and later by
Defendant Susan Dever, which required her to critique the movie which depicted a lesbian love
story.  Defendant Dever is the chairperson of the Department of Cinematic Arts, a part of the
administration at UNM, and was Professor Hinkley's supervisor at all times relevant to this
complaint. (hereinafter referred to as "UNM Administrator Dever").

Qualified immunity shields government officials from civil damages liability *unless* the
official violated a statutory or constitutional right that was clearly established at the time of the
challenged conduct. *Reichle v. Howards*, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (citing
*Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011)).  Here, Professor Hinkley
and UNM Administrator Dever are not entitled to qualified immunity because the Defendants'
actions violated the First Amendment and it was clearly established at all times incident to this

2

lawsuit that students enjoy a right to free speech even when inside a public university classroom. It was clearly established that the only basis to limit or restrict student speech is to further a legitimate pedagogical interest, and this is a bedrock principle that has been enunciated consistently by the United States Supreme Court.

Defendants' actions constitute a violation of *clearly established law* under the First Amendment of the United States Constitution because the Defendants had no legitimate reason to remove Plaintiff from her course, and acted instead, based upon their pretextual disagreement with Plaintiff's viewpoint as expressed in her *Desert Hearts* paper.  Courts have specifically held that a school's restriction must be based on a pedagogical concern, and school officials disagreement with a student's opinion on homosexuality, without a valid pedagogical concern, amounts to an unlawful restriction on speech. *See Hansen v. Ann Arbor Pub. Sch.*, 293 F. Supp. 2d 780, 801-02 (E.D. Mich. 2003).  Restricting Ms. Pompeo's speech based on the Defendants' dislike of the content of her speech is clearly not a legitimate pedagogical interest, and Defendants are not entitled to qualified immunity in order to protect their unconstitutional actions.

Professor Hinkley's Images of Women course promised students that they were being provided with a safe environment to discuss highly sensitive topics.  The course syllabus and Professor Hinkley specifically promised that the purpose and goal of the upper-level, R-rated course was:

> for [participants] to investigate and consider, with open minds, representations of a plethora of genders and sexualities. I hope it's quite clear that we do not expect anyone to necessarily agree with the positions and arguments advanced in our work. There's controversy built right into the syllabus, and we can't wait to hash out our differences.

*See* Doc. 1.1, Plaintiff's Complaint for Civil Rights Violations, Damages and for Declaratory

Relief ("Complaint"), ¶ 2.  As a result of the assignment and with the representations of the course syllabus, Ms. Pompeo's critique analyzed the actresses' "perverse attraction to one another," and likened a lesbian relationship to "barren wombs."  When Professor Hinkley disagreed with Ms. Pompeo's speech, she refused to finish the paper, took actions to have Ms. Pompeo removed from her class, and transferred her to another course taught by UNM Administrator Dever.  Ms. Pompeo was asked to rewrite her critique of the film for UNM Administrator Dever's course, and when she refused to modify her speech, UNM Administrator Dever threatened Ms. Pompeo that her "choices have consequences."

Defendants' arbitrary restrictions of Ms. Pompeo's speech must be prohibited because, as Judge Rosen in *Hansen* noted,   "[t]he danger in this is quite evident ... if schools are permitted to stifle opposing viewpoints ... what is to prevent school administrators in other districts [from engaging in similar restrictions]." *Hansen*, 293 F. Supp. 2d 780, 803.  Judge Rosen concluded: "No matter how well-intentioned the stated objective, once schools get in the business of actively promoting one political or religious viewpoint over another, there is no end to the mischief that can be done in the name of good intentions." *Id.*

## II.    <u>Legal Standard</u>

In Defendants' Motion to Dismiss, Defendants submit that:

> Even if Plaintiff's allegations are true, Plaintiff's claims must fail because Defendants Hinkley and Dever are entitled to qualified immunity. Plaintiff did not have a clearly established free speech right inside Defendant Hinkley's public university classroom because such a space is a nonpublic forum and Defendant Hinkley could limit Plaintiff's speech based on legitimate pedagogical concerns.

*See* Doc. 5, p.3.  Plaintiff's complaint survives a motion to dismiss because it adequately states a claim.

Courts may dismiss a cause of action for failure to state a claim when it appears beyond doubt that the plaintiff can prove no set of facts in support of the theory of recovery that would entitle him or her to relief. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir. 1998). Or, courts may dismiss a cause of action when an issue of law is dispositive. *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). When reviewing a Rule 12(b)(6) dismissal, the Court asks whether there is "a plausibility in [the] complaint." *Bell Atlantic Corp., v. Twombly,* 550 U.S. 544, 564, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The complaint "does not need detailed factual allegations," but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "The plausibility standard...asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

The Court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, *Maher*, 144 F.3d at 1304, and all reasonable inferences from those facts are viewed in favor of the plaintiff. *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984). The issue in resolving a motion such as this is not whether the plaintiff will ultimately prevail, but whether she is entitled to offer evidence to support the claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 184, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1994).

## III.   Factual Allegations

Plaintiff has alleged facts in the Complaint that demonstrate that Defendants violated Plaintiff's right to free speech as protected by the First Amendment. During the 2012 Spring Semester, Monica Pompeo was a part-time student at the University of New Mexico and was enrolled in a class entitled "Images of (Wo)men: From Icons to Iconoclasts," (hereinafter

referred to as "Images of Women") taught by Adjunct Professor Caroline Lawson Hinkley.

Complaint, ¶ 9.  The class was a restricted class, and the syllabus described one of the goals of

this class as follows:

> The intellectual project of this challenging course is for us to investigate and
> consider, with open minds, representations of a plethora of genders and
> sexualities. I hope it's quite clear that we do not expect anyone to necessarily
> agree with the positions and arguments advanced in our work. There's
> controversy built right into the syllabus, and we can't wait to hash out our
> differences.

Complaint, ¶ 10.

Pursuant to a course assignment, on February 21, 2012, Ms. Pompeo submitted a critique

of a film entitled *Desert Hearts*, a movie depicting a lesbian love story. *Id*. at ¶ 12.  Professor

Hinkley did not finish grading Ms. Pompeo's paper at the same time she graded the student

papers of the remainder of the class. *Id.* at ¶ 13.  Instead, Professor Hinkley informed Ms.

Pompeo that she needed to meet with her about her paper and scheduled a meeting on March 8,

2012.  Ms. Pompeo asked for her paper to be returned so that she could look it over prior to the

March 8, 2012 meeting, but Professor Hinkley refused to return the paper. *Id.*  Professor Hinkley

cancelled the scheduled meeting, and gave Ms. Pompeo's paper to the Cinematic Arts office so

that Ms. Pompeo could "ponder the responses" Professor Hinkley had written on her paper over

Spring Break. *Id.* at ¶ 14.  Professor Hinkley delayed the meeting with Ms. Pompeo an additional

two weeks and said they could meet sometime after Spring Break. *Id.*

The comments on Ms. Pompeo's paper demonstrated that Professor Hinkley only

reviewed the first two pages of the four-page critique, and Professor Hinkley refused to assign a

grade to the paper. *Id.* at ¶ 15.  Ms. Pompeo had not received any other critiques of her

performance throughout the year, and had, in fact, received A's and A-'s on all of her other

assignments. *Id.* at ¶ 20, 29.   Once Ms. Pompeo submitted her *Desert Hearts* paper, however, Ms. Pompeo was treated more harshly by Professor Hinkley. *Id.* at ¶ 21.

The Defendants' stated reasons for the critique of and refusal to grade Ms. Pompeo's paper varied.  Specifically, Professor Hinkley, in handwritten notes on Ms. Pompeo's paper, wrote that the critique was inflammatory and offensive.  Professor Hinkley further disparaged Ms. Pompeo's critical review that one of the characters in the movie had a "perverse attraction to the same sex" and a "barren womb." *Id.* at ¶ 16.  On March 20, 2012, however, when meeting with Ms. Pompeo before class, Professor Hinkley accused Ms. Pompeo of "hate speech" and told her that the language used in her paper was the kind of language that would incite violence and endanger people's lives. *Id.* at ¶¶ 17, 23.  It was after giving these conflicting reasons for the refusal to grade Ms. Pompeo's paper that Professor Hinkley informed Ms. Pompeo that it would be in Ms. Pompeo's best interest not to return to her classroom. *Id.* at ¶ 18.  Defendants later changed, for a third time, the reason that Ms. Pompeo was being expelled from her class when, on April 9, 2012, Associate Dean Holly Barnet-Sanchez informed Ms. Pompeo that both UNM Administrator Dever and Professor Hinkley claimed that Ms. Pompeo was disruptive and disrespectful to the professor and students. *Id.* at ¶ 29.

Contrary to Defendants' assertion in their motion to dismiss, Professor Hinkley never objected to the use of the word "cock" in Ms. Pompeo's paper, and it was never given as a reason for her refusal to grade the paper.  Instead, it was Professor James Stone who objected to the use of the word in a meeting which occurred long after Professor Hinkley refused to grade the paper. *Id*. at ¶ 25.  UNM Administrator Dever also later informed Ms. Pompeo that she did not like the use of the word "barren" because it was inappropriate and offensive. *Id.* at ¶¶ 25, 28.

As a result of Ms. Pompeo's speech as expressed in the *Desert Hearts* paper and because Professor Hinkley found that Ms. Pompeo's paper was hate speech, Plaintiff was forced to enroll in an Independent Studies Student course taught by UNM Administrator Dever in place of the Images of Women course. *Id*. at ¶ 27.  UNM Administrator Dever instructed Ms. Pompeo to rewrite her paper and remove the use of certain speech which conveyed specific points, as well as to remove the use of the word "barren." *Id*. at ¶ 28.  Ms. Pompeo stated that she would not change her speech and intended to use the word barren to construe her opinions. *Id*.  In response to Ms. Pompeo's position, UNM Administrator Dever responded that "you can make your choices, certainly, but after so much conversation about the word, we know that, as I said in my e-mail and our meeting, your choices have consequences." *Id.*[1]

Notwithstanding the syllabus for this specially-restricted class which stated that "we do not expect anyone to necessarily agree with the positions and arguments," the Defendants acted out of their disagreement with Plaintiff's positions and arguments. Complaint, ¶¶ 10-11. Defendants rejected Ms. Pompeo's opinions, viewpoints and conclusions in her *Desert Hearts* paper, solely on the basis of the intellectual content of the paper and orally accused Ms. Pompeo of participating in "hate speech." *Id*. at ¶ 17, 23, 25, 27, 28.  More than a month after she turned in her *Desert Hearts* critique, and after she had already been accused of hate speech and asked to change her speech, Defendants informed Ms. Pompeo that she was expelled from the Images of Women class because she was disruptive and disrespectful to the professor and students.  *Id*. at ¶¶ 17, 28-29.

Ms. Pompeo met with numerous members of the UNM administration to discuss her treatment by UNM and Defendants Hinkley and Dever, but no action was ever taken until Ms.

---

[1] The email response came from Defendant Dever.  In Plaintiff's complaint, however, there is a typographical error which illustrates that Professor Hinkley sent the email, although it is clear from the context of the paragraph that the email was sent from Defendant Dever.  This error has been corrected in Plaintiff's First Amended Complaint.

Pompeo filed an official grievance with UNM. *Id.* at ¶¶ 29-34.  Even after an official grievance

was filed, the only effort ever made to repair the violation of Ms. Pompeo's First Amendment

right to free speech was a tuition refund. *Id.* at 35.  These facts, as presented in Plaintiff's

Complaint, sufficiently allege a violation of Plaintiff's right under the First Amendment because

Plaintiff has alleged that Defendants took action against her because they disagreed with her

viewpoints and opinions as expressed in her *Desert Hearts* critique.

## IV.   <u>Argument</u>

### A.   Defendants' motion is moot because Plaintiff has filed an Amended Complaint to conform with the evidence and cure any deficiencies.

Plaintiff has filed her First Amended Complaint to conform with existing evidence. *See*

Doc. 11.  Plaintiff filed her First Amended Complaint in accordance with Fed. R. Civ. P. 15(a).

A "party may amend his pleading once as a matter of course at any time before a responsive

pleading is served." Fed. R. Civ. P. 15(a).  A motion to dismiss is not a 'responsive pleading'

within the meaning of the Rule. *Hanraty v. Ostertag*, 470 F.2d 1096, 1097 (10th Cir. 1972)

(citing *Breier v. N. Cal. Bowling Proprietors' Ass'n*, 316 F.2d 787, 789 (9th Cir. 1963)).

"Neither the filing nor granting of such a motion before answer terminates the right to amend; an

order of dismissal denying leave to amend at that stage is improper, and a motion for leave to

amend (though unnecessary) must be granted if filed." *Breier*, 316 F.2d 787 at 789.

Although Plaintiff believes that there was enough evidence to validly support her claims

for violation of her right to free speech and for declaratory judgment when she filed her

complaint, Plaintiff has filed her First Amended Complaint and cured all of the assertions set

forth by Defendants' motion.  Defendants have not filed a responsive pleading in this case, only

a Motion to Dismiss.  Thus, Plaintiff filed her Amended Complaint before any responsive

pleading was filed, as allowed under Rule 15, and this Motion to Dismiss is now moot.  As such,

Defendants' Motion to Dismiss should be denied.

### B.  Plaintiff had a clearly established free speech right inside Professor Hinkley's classroom.

Defendants assert in their Motion to Dismiss that Plaintiff's complaint should be

dismissed because Defendants Hinkley and Dever are entitled to qualified immunity based upon

their contentions that Plaintiff did not have a clearly established free speech right in Professor

Hinkley's University of New Mexico classroom. Doc. 5, p. 4.[2]

Qualified immunity shields government officials from civil damages liability unless the

official violated a statutory or constitutional right that was clearly established at the time of the

challenged conduct. *Reichle v. Howards*, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (citing

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011)).  Once the defense of

qualified immunity is raised by a defendant, the plaintiff must come forward with facts or

allegations sufficient to show both that the defendant's alleged conduct violated the law and that

the law was clearly established when the alleged violation occurred. *See Workman v. Jordan,* 32

F.3d 475, 479 (10th Cir. 1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1357, 131 L.Ed.2d 215

(1995).  Defendants appear to only challenge whether the law in this case was clearly established

at the times relevant to Plaintiff's complaint.  Nonetheless, Plaintiff has met both requirements in

this case because, as her Complaint alleges, Professor Hinkley's refusal to finish reading

Plaintiff's paper and her removal from Professor Hinkley's class by UNM and Defendants

---

[2] Defendants have asserted that there is "no need for a separate discussion of the New Mexico Constitution because there is no waiver of immunity, but even if there was such a waiver, New Mexico courts have construed the doctrine of qualified immunity in the same way as federal courts." *See* Doc. 5, p. 5 n.2.  Plaintiff has filed her First Amended Complaint alleging only a violation under the United States Constitution, so Plaintiff submits this response in defense of her allegations under the United States Constitution.  Although Plaintiff has withdrawn her claim under the New Mexico Constitution, Plaintiff, disagrees with any implication that the doctrine of qualified immunity applies to claims under the Tort Claims Act, as this is not an accurate statement of the law. *See Todd v. Montoya*, 877 F. Supp. 2d 1048, 1103-04 (D.N.M. 2012) ("Notably, qualified immunity does not apply to [Plaintiff's] claims under the NMTCA").

Hinkley and Dever were a violation of her First Amendment right to free speech.  The actions

here constitute a violation of clearly established law because the Defendants had no legitimate

reason for their actions, and their actions were, instead, based upon their pretextual disagreement

with Plaintiff's viewpoint as expressed in her *Desert Hearts* paper.

The United States Supreme Court has long held that the government may not restrict the

speech of private actors. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467, 129 S.

Ct. 1125, 1131, 172 L. Ed. 2d 853 (2009); *Wooley v. Maynard,* 430 U.S. 705, 714–15, 97 S.Ct.

1428, 51 L.Ed.2d 752 (1977).  "Moreover, it is apodictic that public school students do not 'shed

their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Axson-*

*Flynn v. Johnson*, 356 F.3d 1277, 1284 (10th Cir. 2004) (quoting *Tinker v. Des Moines Indep.*

*Cmty. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)).  It is true, however,

that "the First Amendment rights of students in the public schools are not automatically

coextensive with the rights of adults in other settings, and must be applied in light of the special

characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260,

266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (internal quotation marks and citations omitted).

A university classroom, such as Professor Hinkley's classroom, is a nonpublic forum.

*Axson-Flynn*, 356 F.3d 1277, 1285.  It is also true that the First Amendment requires that any

government restrictions on speech in any kind of forum, even a nonpublic forum, be viewpoint

neutral and the government cannot restrict speech simply because society finds the idea offensive

or disagreeable.  This is a bedrock principle underlying the First Amendment that has been

enunciated repeatedly and consistently in decisions of the United States Supreme Court. *See*

*Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 806, 105 S. Ct.

3439, 3451, 87 L.Ed.2d 567 (1985)("control over access to a nonpublic forum can be based on

subject matter and speaker identity so long as the distinctions drawn are reasonable ... and are viewpoint neutral."); *Good News Club v. Milford Central School,* 533 U.S. 98, 131, 121 S. Ct. 2093, 2113, 150 L.Ed.2d 151 (2001) (same); *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682, 118 S. Ct. 1633, 1643, 140 L.Ed.2d 875 (1998) ("To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose for the property."); *Texas v. Johnson,* 491 U.S. 397, 414, 109 S. Ct. 2533, 2545, 105 L.Ed.2d 342 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

The Tenth Circuit, however, has allowed viewpoint-based speech restriction in some circumstances in a school setting. *See Fleming v. Jefferson County Sch. Dist,* 298 F.3d 918 (10th Cir. 2002). In *Fleming,* Columbine High School officials censored students' painting of tiles which were part of a project intended to make students feel more comfortable with their surroundings in the aftermath of the 1999 killings of 12 students and teachers by two CHS students. *Id.* The Tenth Circuit determined that, in a school setting, *Hazelwood* did not require viewpoint neutrality when educators made decisions about school-sponsored speech and allowed such restrictions in order to address a legitimate pedagogical concern. *Id.* at 926-27, 934. Even though the Tenth Circuit held that educators' restrictions do not have to be viewpoint neutral, such a restriction cannot be an arbitrary, viewpoint-based discrimination if there is no legitimate pedagogical concern to be addressed. *Id.* at 932. Thus, both the Tenth Circuit and the United States Supreme Court have recognized the necessity of a pedagogical concern before a restriction will be allowed. *Id.* at 932; *Cornelius,* 473 U.S. at 811. Specifically, the United States Supreme Court has held that in a nonpublic forum, such as the UNM classroom in this case, even where

there are reasonable grounds for the restriction, the "existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." *See Cornelius,* 473 U.S. at 811.

In *Fleming*, the Tenth Circuit allowed the school to restrict the content of tiles placed around a public school which could be viewed by the entire community because the court found a pedagogical purpose existed in limiting speech which could lead to a potentially disruptive educational environment for the students of Columbine High School. *Fleming*, 298 F.3d 918, 931-32. In the instant case, Ms. Pompeo's critique paper was turned in privately to Professor Hinkley as part of a course that specifically invited controversy and for all class participants to hash out their differences. The paper was not distributed to anyone other than Professor Hinkley and it was never publicized. The paper was a direct critique of the movie assigned by Professor Hinkley and was not to be seen by the public or any other students in the course, unlike the tiles in *Fleming*.

Here, Defendants restricted Ms. Pompeo's speech solely because they disagreed with the views expressed in her paper. The Defendants were not protecting the educational environment, as the court determined was done in *Fleming*, and they were not preventing a disruptive atmosphere from developing at the University of New Mexico. Thus, a pedagogical purpose is completely lacking here. Defendants themselves, through the course of their actions, made it clear that the real reason for removing Ms. Pompeo from the Images of Women course was solely because they disapproved of the views expressed in her paper. The restrictions by Defendants in this case were not viewpoint neutral nor were they in furtherance of a legitimate pedagogical concern, and where such restrictions exist, there is no qualified immunity protection

because it is a clearly established law that restrictions based upon viewpoints with no

pedagogical purpose, even when inside a classroom, must not be tolerated.

This case nearly mirrors *Hansen v. Ann Arbor Pub. Sch.*, 293 F. Supp. 2d 780 (E.D.

Mich. 2003), and the court's reasoning and holdings in *Hansen* are of the utmost importance here

because *Hansen* demonstrates that restrictions based on the distaste of a student's views on

homosexuality are not viewpoint neutral nor are they related to a legitimate pedagogical concern.

In *Hansen,* a federal court in the Sixth Circuit addressed claims by a high school student that her

First and Fourteenth Amendment rights had been violated when the school invited sympathetic

clergy as panelists on an assembly program on homosexuality, but barred the student from

expressing her view that homosexuality was a sin at the panel presentation and at a subsequent

student assembly. *Id.* at 785.  The panel in the school assembly was specifically designed to offer

a more welcoming message regarding homosexuality. *Id.*  The teacher in charge of the panel

initially stated that she did not want the student's message included in the panel because it would

contradict the panel's intent and could hurt peoples' feelings or offend people. *Id.* at 789.  The

school later proffered that the student was prevented from speaking at the assembly because she

did not follow proper procedure and that the pedagogical concerns addressed by their actions

were: (1) teaching students to stay on topic; (2) teaching students to follow proper procedures;

(3) making students aware of minority points of view; and (4) creating a safe and supportive

environment for gay and lesbian students. *Id.* at 790, 797.

In reviewing the matter, the court noted that under *Hazelwood,* the school officials "were

certainly entitled to some degree of editorial control over the school-supervised programs so long

as their actions ... were reasonably related to legitimate pedagogical concerns." 293 F. Supp. 2d

at 797.  The *Hansen* court recognized, however, that putting aside for the moment the proffered

pedagogical concerns, "[school officials] overlook the fact that even under *Hazelwood,* a school does not have a completely unfettered right to restrict speech." The Sixth Circuit, as well as other circuits, has held that *Hazelwood* requires viewpoint neutrality. *Id.* at 799; *see also Searcy v. Harris,* 888 F.2d 1314, 1319, 1325 (11th Cir. 1989) (finding no indication in *Hazelwood* that the Supreme Court "intended to drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's views" and holding that school officials are required "to make decisions relating to speech which are viewpoint neutral"); *Planned Parenthood v. Clark County Sch. Dist,* 941 F.2d 817, 829 (9th Cir. 1991) (finding that the "reasonableness" required to justify school authorities to regulate speech under *Hazelwood* requires viewpoint neutrality*)*. While this is not the holding of the Tenth Circuit, *Hansen* is still influential in this case, however, because it demonstrates the complete lack of pedagogical concern addressed by actions which are intended only to stifle criticism of homosexuality.

Accordingly, it is significant that, although the school officials in *Hansen* tried to justify their actions as legitimate pedagogical concerns, the court stated that:

> [A] close examination of Defendants' own description of their purported 'legitimate pedagogical concerns' belies any attempt to justify their actions as "viewpoint neutral." Defendants maintain that the legitimate pedagogical objectives advanced by their actions in restricting [the student's] speech included teaching students to stay on topic, making students aware of minority points of view, creating a safe and supportive environment for gay and lesbian students. According to Defendants, each of these pedagogical concerns is, "legitimate" by "accepted standards of educational theory and practice." . . . Yet, in explaining how each of these goals were furthered by restricting [the student's speech, it is not educational theory or practice that Defendants rely upon, but rather it is their specific disapproval of the message that [the student] would have conveyed that underlies their decision.

*Hansen*, 293 F. Supp. 2d 780, 800. The *Hansen* court went on to note the importance of the glaring intolerance that rises up when only one view on homosexuality is allowed. Specifically, the court stated:

15

> That Defendants can say with apparent sincerity that they were advancing the goal of promoting "acceptance and tolerance for minority points of view" by their demonstrated *in* tolerance for a viewpoint that was not consistent with their own is hardly worthy of serious comment. Suffice it to say that inherent in this rationale is the premise that the [] view of homosexuality as a religious sin is not a minority view, or at least not a minority view which should be tolerated. It strikes the Court that neither of these premises are pedagogical concerns, but rather are political, cultural or religious, or all three.

*Id.* at 801-02.  After reviewing the evidence before it, the *Hansen* court concluded that the school officials were motivated "by their disagreement with [the student's] message and their decisions restricting [her] speech" and the decision to exclude her viewpoint from the Homosexuality and Religion panel was not motivated by any legitimate pedagogical concern, nor was it viewpoint neutral. *Id.* at 803.

Equally important, the *Hansen* court recognized the broad threat of censorship and the chilling of all manner of student speech implicit in the conclusion that viewpoint neutrality was not required in regulating school-sponsored speech.  The court pointed out: "[t]he danger in this is quite evident . . . if schools are permitted to stifle opposing viewpoints . . . what is to prevent school administrators in other districts [from engaging in similar restrictions]." *Id*.  The *Hansen* court concluded: "No matter how well-intentioned the stated objective, once schools get in the business of actively promoting one political or religious viewpoint over another, there is no end to the mischief that can be done in the name of good intentions." *Id.*

Despite this existing case law, in support of their motion, Defendants rely heavily on *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1289-90 (10th Cir. 2004) to support their qualified immunity defense and argument that there was no clearly established law that such restrictions as were made in this case were in violation of the First Amendment.  In *Axson-Flynn*, a university student brought suit against the acting program's faculty, alleging that her free speech and free exercise rights under the First Amendment were violated by their requirement that she must say

certain offensive words when performing a script. *Id.* at 1281-82.  As part of the college-level acting course, the university insisted that the student must recite the lines of a play, even if she thought they were offensive. *Id.*  Unlike the instant case, however, the student in *Axson-Flynn* was never suspended or explicitly threatened with expulsion, but Defendants did make it clear that the student would not be able to continue in the program if she refused to say the words with which she was uncomfortable. *Id.* at 1290.

The *Axson-Flynn* court found that Defendants' actions were allowable because they advanced the school's pedagogical interest in teaching acting, and upheld the claim for qualified immunity. *Id.* at 1291.  The court explained that because the speech was to take place in the classroom context as part of a mandated school curriculum, it was clearly school-sponsored speech, and requiring an acting student to speak the exact words of a script as part of a classroom exercise prepares a student for a professional acting career, and as long as the compulsion is not pretextual, is reasonably related to pedagogical concerns. *Id.* at 1290-92.  In reaching its conclusion, however, the court recognized that "age, maturity, and sophistication level of the students will be factored in determining whether the restriction is 'reasonably related to legitimate pedagogical concerns.'" *Id.* at 1289-90 (citing *Ward v. Hickey,* 996 F.2d 448, 453 (1st Cir. 1993) ("[W]hether a regulation is reasonably related to legitimate pedagogical concerns will depend on, among other things, the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation").  The *Axson-Flynn* court also recognized the direction given by the United States Supreme Court in *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) and noted that courts "may override an educator's judgment where the proffered goal or methodology was a sham pretext for an impermissible ulterior motive." *Axson-*

*Flynn,* 356 F.3d 1277, 1293 (citing *Settle v. Dickson Cnty. Sch. Bd.*, 53 F.3d 152, 155-56 (6th

Cir. 1995) ("So long as the teacher limits speech or grades speech in the classroom in the name

of learning and not as a pretext for punishing the student for her race, gender, economic class,

religion or political persuasion, the federal courts should not interfere.")

Defendants also rely heavily on *Corlett v. Oakland Univ. Bd. of Trustees*, No. 13-11145,

2013 WL 3810421 (E.D. Mich. 2013), a case which like *Hansen*, originates from a federal court

in the Sixth Circuit.  In *Corlett*, the Court was faced with a university student who brought an

action alleging a violation of his freedom of speech protected under the First Amendment for

disciplinary action taken after he referred to his professor as "stacked" and included a fetishized

description of her in a writing assignment. *Id*. at *1.  The assignment was written for an

Advanced Critical Writing course, and the student was tasked with completing multiple entries

into a Daybook as "an ongoing volume that essentially functions as a place for a writer to try out

ideas and record impressions and observations. Your Daybook will take things a bit further by

including vocabulary and reflections on passages from our readings." *Id*. at *2.

*Corlett* recognized that "the free-speech clause generally prohibits suppressing speech

because of its message, and the Court has enforced that prohibition in the public school—indeed

the university—setting." *Id.* at *6 (quoting *Ward v. Polite,* 667 F.3d 727, 733 (6th Cir. 2012)).

But also noted that, "a school need not tolerate student speech that is inconsistent with its basic

educational mission...." *Corlett*, 2013 WL 3810421, *7 (quoting *Hazelwood Sch. Dist. v.

Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988)).  The court ultimately held

that the university could restrict the student's speech because the student's "expressions of lust

for [his teacher] or descriptions of her physical appearance are not entitled to First Amendment

protection . . . 'Self-expression is not to be equated to the expression of ideas or opinions and

18

thus to participation in the intellectual marketplace.'" *Id.* at *14 (quoting *Brandt v. Bd. of Educ. of City of Chicago,* 480 F.3d 460, 465 (7th Cir. 2007)).  In reaching this holding, however, even the *Corlett* court recognized that "the leeway granted educators to curtail speech within the school gates depends on the content of the student's speech and the context surrounding its making." *Corlett*, 2013 WL 3810421, *7 (E.D. Mich. 2013).

The instant case, however, is highly distinguishable from both *Axson-Flynn* and *Corlett*. In this case, Professor Hinkley's class was an upper-level, restricted course designed for a university setting which would host an older, more mature and sophisticated group of students. Complaint, ¶ 10.  As *Axson-Flynn* makes clear, this is something that must be taken into consideration when determining whether Professor Hinkley's censorship of Ms. Pompeo's paper was "reasonably related to a legitimate pedagogical concern."  The Defendants were not forcing Ms. Pompeo to argue a point she was uncomfortable with or speak words she found offensive. Instead, they took action against her because of the views expressed in her course-assigned critique paper that was turned in privately to Professor Hinkley.

The paper was not a paper of self-expression like in *Corlett*, and Ms. Pompeo was not using her paper to air her "brazen and irrelevant thoughts" as Defendants' Motion to Dismiss suggests. Doc. 5, p. 9.  Unlike the student in *Corlett,* Mr. Pompeo curtailed her criticism to run parallel to the movie, *Desert Hearts*, and did not use her paper as a soapbox.  Ms. Pompeo's critique was directly relevant to and complied with the assignment given by Professor Hinkley, and unlike the student in *Axson-Flynn*, she did not refuse to comply with the assignment and did not stray from the confines of the course.  Nothing in Ms. Pompeo's critique was inconsistent with the basic educational mission of the Images of Women course and she was clearly participating in the "intellectual marketplace" at UNM.  Ms. Pompeo's *Desert Hearts* paper was

a critique of the movie and the context of the film, as specifically required in the syllabus, and Ms. Pompeo's paper was written under the guise of a mature, restricted-level class where it was written policy that not all opinions would be liked or agreed upon.

Notwithstanding the written policies expressed by Defendants in the Images of Women syllabus, as illustrated by Plaintiff's Complaint and much like the student in *Hansen*, Ms. Pompeo's paper was censored and she was expelled from the course because Defendants disagreed with Ms. Pompeo's ideological viewpoint and opinions and believed her to be homophobic. Professor Hinkley refused to finish reading Ms. Pompeo's critique paper based solely on this pretextual reason that Defendants are now attempting to disguise as a legitimate pedagogical concern. She did not simply give Ms. Pompeo a failing grade for her critique; she refused to even finish reading the paper because she was so offended by Ms. Pompeo's speech. Ms. Pompeo did not use profane language in her critique of Desert Hearts. She used language which the Defendants did not like, such as the words "barren womb" to describe a lesbian. Plaintiff did use the word "cock" in her paper, but Professor Hinkley and UNM Administrator Dever did not take issue with the use of this word and it is not the reason Professor Hinkley refused to read Ms. Pompeo's paper and remove her from her course. It was only during a later meeting with James Stone that any issue with the use of this word was ever discussed.

Moreover, as *Corlett* recognized, the context in which Ms. Pompeo's critique was written was an R-rated collegiate course. This context is highly important in determining whether Defendants' actions were in furtherance of any pedagogical interests because the course itself invited exactly this sort of critique and discussion. The syllabus was brought to life by the classroom environment and the movies shown, and the course directly involved the discussion of sexually implicit content and addressed topics having to do with sexuality and homosexuality.

Thus, the course itself diminishes any argument that Ms. Pompeo's speech was offensive or inappropriate.

Contrary to established law, the Individual Defendants pretextually disagreed with the general nature and context of Ms. Pompeo's paper because it negatively criticized the movie *Desert Hearts* and lesbianism. Unlike the cases above, Ms. Pompeo's paper did not disregard the curricular requirements as Defendants' motion suggest. Instead, it strictly complied with the requirements of the assignment and was written under the guise of a course syllabus that explicitly stated that:

> The intellectual project of this challenging course is for us to investigate and consider, with open minds, representations of a plethora of genders and sexualities. I hope it's quite clear that we do not expect anyone to necessarily agree with the positions and arguments advanced in our work. There's controversy built right into the syllabus, and we can't wait to hash out our differences.

Complaint, ¶ 10. The paper submitted by Ms. Pompeo simply portrayed a viewpoint which the Defendants disagreed with. There were no legitimate pedagogical concerns which were remedied by removing Ms. Pompeo from her Images of Women course or refusing to grade her paper, and it was solely for the stated pretextual and illegitimate reason that Ms. Pompeo was ultimately forced out of her class against her First Amendment right. The alleged "legitimate pedagogical concerns" that Defendants now set forth are nothing more than an *ex post facto* attempt to justify the illegitimate discrimination by the Defendants against Ms. Pompeo. Furthermore, at the time of the occurrences in this case, as demonstrated above, it was clearly established that, even in a nonpublic forum, a teacher cannot restrict a student's speech based upon a pretextual and viewpoint-based reason. As such, Ms. Pompeo's complaint demonstrates that Ms. Pompeo had a clearly established and protected right in Professor Hinkley's classroom and Defendants' Motion to Dismiss must be denied.

**C.      Plaintiff's declaratory judgment against the UNM Board of Regents does not fail because Professor Hinkley and UNM Administrator Dever are not entitled to qualified immunity.**

Professor Hinkley and UNM Administrator Dever are not entitled to qualified immunity, and an actual controversy exists between Plaintiff and the Defendants.  As such, Plaintiff's declaratory judgment action should not be dismissed.  The Federal Declaratory Judgment Act sets forth that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.A. § 2201(a).  "Federal courts are authorized to issue declaratory judgments only in cases of actual controversy." *Icarom, PLC v. Howard Cnty., Md.*, 904 F. Supp. 454, 457 (D. Md. 1995).

In the instant case, Defendants took action against Plaintiff solely because they disagreed with Ms. Pompeo's opinion and considered it to be hate speech.  There was no legitimate pedagogical concern to be addressed by refusing to grade Ms. Pompeo's paper.  If the paper did not conform to the assignment, Professor Hinkley and UNM Administrator Dever each had the opportunity to assign Plaintiff a failing grade, instead of refusing to finish evaluating the critique, recommending that Plaintiff not return to class and removing her from the course.  As Plaintiff has set forth above, Defendants' actions were pretextual and thus, they should not be granted qualified immunity.  As a result, Plaintiff has asserted valid claims for a violation of her right to free speech, and her qualified immunity claim does not fail because an actual controversy exists.

Furthermore, Defendants' baseless assertion that "Plaintiff has deliberately ignored the Defendants' efforts in her hasty route to the courthouse" is unsupported by the facts and irrelevant to her declaratory judgment claim.  Plaintiff filed this lawsuit more than sixteen months after Plaintiff's rights were violated, and did so after numerous attempts to work the

problem out with UNM professors and administration.  Plaintiff is bound by law to file her claim within the applicable statute of limitations, and the purpose of requiring Plaintiff to file within the required statute of limitations is clear: to give Defendants "timely notice that litigation arises from a particular transaction or occurrence." *See Ripley v. Childress*, 695 F. Supp. 507, 509 (D.N.M. 1988).  Additionally, Defendants' refund of Plaintiff's tuition does not remedy the violations against her; it was merely a refund of a class she was unable to take in its entirety. Thus, Defendants claim that "Plaintiff has deliberately ignored the Defendants' efforts in her hasty route to the courthouse" has not been made in good faith and should be given no weight in considering whether qualified immunity has been established or whether Plaintiff has sufficiently stated her declaratory judgment claim.

      **D.**    **Plaintiff's First Amended Complaint only brings action under the United States Constitution.**

      Plaintiff has filed her First Amended Complaint, Doc. 11.  The amended complaint only brings action under the United States Constitution.  As such, any argument that Plaintiff's claims fail under the New Mexico Constitution is now moot and the motion should be dismissed as stated above.

      WHEREFORE, for the above reasons, Plaintiff asks that this Court deny Defendants' Motion to Dismiss.

Respectfully submitted,

*/s/   Louren Oliveros  11/06/2013____*
Louren Oliveros, Esq.
Robert J. Gorence, Esq.
Andrea D. Harris, Esq.
Gorence & Oliveros, P.C.
Attorney for Plaintiff
1305 Tijeras Avenue, NW
Albuquerque, New Mexico 87102
Telephone: (505) 244-0214
Facsimile: (505) 244-0888
E-Mail: oliveros@gopcfirm.com
           gorence@gopcfirm.com
           harris@gopcfirm.com

       I HEREBY CERTIFY that a true and correct copy of Plaintiff's Response was emailed by CM/ECF to all parties entitled to notice on this 6th day of November, 2013.

*/s/   Louren Oliveros  11/06/2013*
Louren Oliveros