IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MONICA POMPEO,

      Plaintiff,

vs.                                                            Civ. No. 13-0833 MCA/CG

BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO, *et al.*,

      Defendants.

## MEMORANDUM OPINION AND ORDER

      This case is before the Court upon Defendants' Motion for Summary Judgment [Doc. 30]  The Court has considered  the written submissions of the parties, the record in this case and the applicable law, and is otherwise fully advised.  Defendants' motion is granted.

**Summary Judgment Standards**

      Fed. R. Civ. P. 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  As our Court of Appeals has succinctly stated:

> A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented.

A*damson v. Multi Cmty. Diversified Serv., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). "It is not [the court's] province at the summary judgment stage to weigh the evidence or to make credibility determinations." *Sanders v. Southwestern Bell Tel., L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008).

**Qualified Immunity**

> Resolution of a dispositive motion based on qualified immunity involves a two pronged inquiry. First, a court must decide whether the facts a plaintiff has alleged or shown make out a violation of a constitutional right. Second, . . . the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. With regard to this second [prong], the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances presented. A reviewing court may exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Qualified immunity is applicable unless the plaintiff can satisfy both prongs of the inquiry.

*Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (citations and internal quotation marks omitted).

**Background**

The record, viewed in the light most favorable to Plaintiff, would allow a reasonable jury to find the following facts.

During the spring semester of 2012, Plaintiff enrolled in "Images of (Wo)men: From Icons to Iconoclasts," an elective class offered by UNM's Cinematic Arts Department and taught by Professor Caroline Hinkley.    The course was a restricted class, offered to upper level students.  [Doc. 49-1 at 1]  The syllabus[1] described the class thus:

> Building upon scholarship from that of Gus Blaisdell (who first conceived this course) to the work of gender theorists (who first analyzed the category 'woman'), our study will regard films that address women, men, and everybody else.  As Blaisdell taught us, we will examine "the possibility that 'the women' might exist beyond the scope of cinematic representation."  And we'll also examine the possibility that "(wo)men" might exist beyond the movies' capacity to imagine us all.  Through classical genres, experimental styles, and new or alternative cinemas, this course will explore how issues of race, class, nationality, history, and sexuality shape and reshape the debates about 'the woman,' calling into question the idea that 'woman' is a unified category.  We will cover a wide range of themes, discuss oppressive and  transgressive gendered images and sounds; feminine (dis)identification; transnational traffic in images of 'women';  girl pop-culture; sexing 'woman' as fetishized object; the gay gaze and the lesbian look; classism and the politics of pleasure; partial/resistant viewing practices; gendering cultural and historical theories of reception; drag spectatorship; and emergent approaches to imag(in)ing experimental and 'aberrant' desire.

[Doc. 49-1 at 1]  The syllabus alerted  students to the possibility of "incendiary class discussions" and that the course "might not make you comfortable."   The syllabus  made clear that notwithstanding the potentially controversial nature of the subject matter, students were expected to express themselves with "respect and care for everybody's marvelously complex subjectivities" maintaining "an environment pleasant for all."   The pedagogical goals of the class were to teach students "to write a critical and analytic paper," "to promote an  atmosphere of inclusion and equity within the class," and  "to

---

[1] Professor Hinkley was not the author of the syllabus, which had been written several years before she taught the class. [Doc. 49-2 at 2; Doc. 49-7 at 3]

teach students how to think critically, to discern a critical argument from opinions and polemics." [Doc. 49-2 at 3-4]

Plaintiff submitted papers on *Christopher Strong*, and *The Women*, receiving grades of "A-" and "A." [Doc. 49-5 at 2] On February 21, 2012, Plaintiff submitted a four page paper [Doc. 30-6] on *Desert Hearts*, a 1985 film depicting a lesbian romance. [Doc. 30-6] Plaintiff's paper was harshly critical of the lesbian characters portrayed in the film and of lesbianism in general. Plaintiff referred to one character as "still sexually vibrant, in spite of her perverse attraction to the same sex"; to lesbianism as a "very death-like state as far as its inability to reproduce naturally"; and to the film generally as "entirely perverse in its desire and attempt to reverse the natural roles of man and woman in addition to championing the barren wombs of these women." After the *Desert Hearts* paper, Plaintiff submitted a paper discussing two Marilyn Monroe films, *Diamonds Are a Girl's Best Friend* and *Gentlemen Prefer Blondes*. Professor Hinkley gave Plaintiff an "A" for this paper.

Professor Hinkley read Plaintiff's entire *Desert Hearts* paper [Doc. 30-4 at 2], writing comments on the first two pages. Professor Hinkley's comments were thoughtful and appropriately professorial, and appear to have been designed to engage Plaintiff in an academic dialogue. For example, in response to Plaintiff's comment about a character's "perverse attraction to the same sex," Professor Hinkley noted in the margin "Why is attraction to the same sex perverse? This is a strong statement that needs critical backup. Otherwise it's just inflammatory." Having read the entire paper, Professor Hinkley wrote "Monica, as you will see I stopped commenting after the second page. We can talk about

4

that when we meet" on the cover page of Plaintiff's paper. [Doc. 49-3 at 2]  Professor

Hinkley had not assigned a grade because she wanted to give Plaintiff the chance to earn a

higher grade by rewriting the paper. [Doc. 49-4 at 3]   During the March 6, 2012 class,

Professor Hinkley returned the other students' *Desert Hearts* papers, which she had

graded.

Plaintiff and Professor Hinkley set up a meeting for March 8, 2012, which fell

through when Professor Hinkley canceled the meeting in a March 7, 2012 e-mail. In her e-

mail, Professor Hinkley told Plaintiff that she could pick up her paper at the Cinematic

Arts Department office, and that over spring break she should "ponder the responses" that

Professor Hinkley had written on Plaintiff's *Desert Hearts* paper. [Doc.  11 at 4, ¶ 20]

Plaintiff and Professor Hinkley eventually met after spring break for about 45

minutes prior to class on the afternoon of Tuesday, March 20, 2012.  [Doc. 49-5 at 2]

Professor Hinkley and Plaintiff went through Plaintiff's paper.  Professor Hinkley was

personally offended by some of Plaintiff's anti-lesbian remarks.  [Doc. 49-3 at 7]

Professor Hinkley questioned Plaintiff's use of the term "barren wombs" and Plaintiff's

characterization of lesbianism as "perverse."  Professor Hinkley told Plaintiff that parts of

Plaintiff's *Desert Hearts* paper could be considered "hate speech." Plaintiff shared with

Professor Hinkley that she "liked rough men, that she liked rough sex with men, and that

she found lesbians to be like weak men."[2]  Plaintiff told Professor Hinkley that some of

---

[2] The Court mentions this circumstance  to distinguish this case from cases in which the plaintiff's free speech claim has religious implications.  *See Axson-Flynn v. Johnson*,  356 F.3d  1277, 1293 (10th Cir. 2004) (noting genuine issue of fact as to whether proffered justifications for requiring student to strictly conform to curriculum was a pretext for religious discrimination).  Plaintiff's objections to lesbians appear to be purely secular and do not raise Free Exercise concerns.

the films she had watched for class were unendurable.  Professor Hinkley responded that

there were likely to be more films that Plaintiff would find unendurable. [Doc. 49-4 at 1]

Plaintiff interpreted Professor Hinkley's remark as a suggestion that it would be in

Plaintiff's best interests not to return to class.  But somewhat inconsistently, Plaintiff also

recalled Professor Hinkley proposing that Plaintiff  write a new paper on a different film,

for which paper Plaintiff would likely receive a good grade.  Plaintiff left the meeting

believing that her status in Professor Hinkley's class remained up in the air.  Professor

Hinkley left the meeting believing that Plaintiff had agreed to rewrite her *Desert Hearts*

paper. [Doc. 49-3 at 1] The meeting ended when it was time for class to begin.

Plaintiff attended class that afternoon. During the class Plaintiff engaged in off-

topic rants about Tony Curtis's sexuality and Elizabeth Edwards. [Doc. 49-4 at 1]

The next day, March 22, 2012,  Plaintiff unsuccessfully attempted to meet with

Professor Hinkley.  Later in the day she met with UNM Provost Jane Slaughter to discuss

her concerns about Professor Hinkley and  the Images of  (Wo)men class.  Plaintiff also

met with Assistant Dean Holly Barnet-Sanchez, who told Plaintiff that she should first

raise her concerns to Professor Hinkley's immediate superior, Professor Susan Dever,

Department Chair of the Cinematic Arts Department. [Doc. 49-5 at 3]   Plaintiff wrote out

a statement claiming that Professor Hinkley had  "refused" to grade Plaintiff's *Desert*

*Hearts* paper, accused Plaintiff of hate speech, and mischaracterized her paper as an

"opinion  paper."

On the following day, March 23, 2012, Plaintiff met with Professor Dever and

Professor James Stone, an assistant professor in the Cinematic Arts Department.

6

Professors Dever and Stone explained to Plaintiff that the words "barren" and "cock" as used by Plaintiff in her Desert Hearts paper were inappropriate and offensive. Professor Dever told Plaintiff that if Plaintiff persisted in the use of barren there would be academic "consequences." Plaintiff conceded that she had written a "barking dog of a paper."[3] When the meeting concluded, Professor Dever understood that Plaintiff had agreed to remain enrolled in the Images of (Wo)men class, which would be converted to an outside-the-classroom independent study format with Professor Dever as Plaintiff's instructor. The *Desert Hearts* paper would not be considered in assigning Plaintiff a grade, which would be based on the grades Professor Hinkley had given to Plaintiff's other papers and Plaintiff's further work under Professor Dever. Plaintiff felt that she had no choice but to agree to the independent study format proposed by Professor Dever.

 In an e-mail dated Monday, March 26, 2012, Professor Dever documented her understanding of the outcome of the March 23, 2012 meeting:

  Dear Monica,
  Though the impetus for our meeting may have been stressful, I am pleased
  we were able to use those very difficulties as a springboard for learning.
  Dr. Stone and I found our Friday conversation to be very productive; we
  hope you did, too.

  I look forward to completing the term with you as my Independent Studies
  student, as we discussed. I'll forward this letter to Professor Hinkley, who

---

[3]In her Amended Response to Defendants' Motion for Summary Judgment, Plaintiff disputes this statement. However, she does not refer the Court to any evidence supporting her position as required by D. N.M. LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies. . . ."). In contrast, both Professor Stone and Professor Dever recalled Plaintiff referring to a "barking dog of a paper," and Professor Dever's recollection was quite specific. [Doc. 30-7 at 2, ¶ 6; Doc. 49-9 at 6] The Court will consider the "barking dog" statement as undisputed for purposes of Defendants' motion . Fed. Civ. P. Rule 56(d)(2).

has already agreed with the new arrangement, as a formal acknowledgement. Instead of attending class or writing papers for "-Images of Women," you'll meet three times with me, supplementing those meetings with e-mail exchanges or phone calls. (With my thanks for your remembering my vastly oversubscribed schedule.)

Together we'll craft a plan for your work, borrowing, where we find it useful, from the syllabus.  I think it might be best to work with the short-paper format to begin; after that we can decide what direction to take.  The amount of work will be roughly equivalent to what you would do in any half-term class in Cinematic Arts.  At the end of the semester I will determine your grade, based upon your initial papers and whatever you accomplish with me.  As we agreed, given our thorough review of the ungraded paper, we'll chalk that up to a learning experience that will not feature in your final portfolio.  At the end of the term, Professor Hinkley will submit your grade and you will receive whatever credit you've earned.

So:  let's indeed begin with a four-page paper on Douglas Sirk's All that Heaven Allows.  I was intrigued by your thoughts on Jane Wyman's character as presented through her costuming and make-up.  There's a very good article on the use of color that I'd like you to read: you'll find Mary Beth Haralovich's essay listed on the syllabus. (Please let me know if the photocopy is in any way illegible.) In your essay, please make use of your skills in "reading" moving images? and for that, do go back and watch/listen to the film again? plus, very key, also launch a dialogue with Haralovich.  In reading her work, see how she makes a point, even offers an opinion, backing up her argument with textual analysis.  By engaging a critic, you'll shore up your own viewpoints, as you'll offer your readers a "way in" to consider the movie from their own perspectives.

Along the way, Monica, you and I will continue our? could it be??three hour conversation already begun about writing, from evidence-building of thesis points to the generous nature of offering a critical interpretation to your readers.  Since the papers we write are intended for an intellectual audience anywhere, we'll keep in mind the culture of a wide, diverse group.  Academic terminology, but not stuffiness, is the goal.  Positing a thesis, rather than stating an opinion, will strengthen your work in this context.

We'll approach this one step at a time, maintaining the respect we've already shown for each other, thinking about how to demonstrate that for readers.  We may not necessarily agree with each other's intellectual reasoning, but we'll aim to puzzle things out with an equal measure of vision and equanimity.

Let's see how the excellent training you've received thus far from Professor Hinkley will continue with our work, as you move into what we might call an 'interdependent" study.  There will be an increased amount of effort required on your part as you spend what would have been class time on your own?in the library, at the computer?but we'll look at the work you produce when we sit down again together.

As soon as I can find my "Checklist for Writing and Essay" I'll send it to you as promised. I'd also like you to read Timothy Corrigan's short text on writing about cinema.   Might have a copy you could borrow, or please look for it in the library.  Super clear and helpful.

I very much appreciated your willingness to enter into these and other conversations with great openness on Friday.  I'm glad you now understand the process by which students can appeal differences.  In what I perceive as an unlikely event, based on that openness, that you might still wish to address something you think we can't work out together, you of course have the right to speak with our Associate Dean, Dr. Holly Barnet Sanchez. That said for the record, my feeling is that you and I have already begun.

Again, I look forward to working with you in the smart, kind, brave, and powerful tradition that is Cinematic Arts.

Warmly, Susan

Dr. Susan Dever, Chair, Cinematic Arts

[Doc. 49-6 at 2-3]

On March 27, 2012,  Professor Dever e-mailed Plaintiff, apparently attaching  the "Writer's Checklist" she had mentioned in her March 26, 2012 e-mail.  This was the first time that Plaintiff had been provided with the Writer's Checklist. [Doc. 49-5 at 2] Professor Dever briefly discussed the Sirk paper and proposed that Plaintiff and she exchange e-mails prior to meeting the next week.

On March 29, 2012,  Plaintiff sent the following e-mail to Professor Dever:

Hi Susan,

I think I need to talk again.  I'm feeling like I've done something wrong & I've been quietly removed from the classroom.  I may want to speak with Holly Barrett-Sanchez, forgive me if I've gotten her name wrong.

I wish I weren't feeling like this.

Monica

[Doc. 49-6 at 1]

Later on March 29, 2012,  Professor Dever responded to Plaintiff's e-mail:

Hi dear Monica,

Let's do talk some more; I quite understand.  It's important to address whatever we feel, and then, as we might do with a good friend after a cuppa, gently set thoughts aside to attend to other things.  You and I might find ourselves coming back to those rising and falling thoughts over the course of our work together, noticing all sorts of things and then returning to the focus of our work.  I find it a very useful way to proceed; we get lots done, and at the same time, nothing is swept under the rug.

You may of course visit Associate Dean Holly Barnet Sanchez, but I do think the two of us have really begun to work productively together.

Your willingness to be open about how you feel is great first step. Second step is to realize that, just as we evaluate a movie without any notions of "good/bad"—asking ourselves instead "how is it working?"—we don't have to blame/praise or "good/bad" ourselves in the process. We just observe:  "how are things working?"  No judgment.

That's the source of academic strength.

And you already have that.  There's nothing to fix here.  But like everybody, our core intellects get obscured by a lot of ephemeral stuff.  Then we do all those things we hardly realize:  talk out of turn or too much, "bark" instead of speak.

When that happens (and it happens to every last one of us, or how would I know what I am writing about here, oh my!) we just stop and push "reset."

10

What I am proposing is that we pause together, and begin to work very gently to get to the core of your power as an unassailable writer, thinker, classroom interlocutor.  In our Department our goal is to figure out how to skillfully position folks in whatever learning environment might constitute the most effective way to teach/learn these life-long lessons.

As we delightedly chatted on the patio of the best eatery in Abq when we chanced to meet Tuesday night, I had the distinct flash that you will employ your natural openness, curiosity and, yes, even courage, to complete this term, encouraging yourself a bit further than you might have had you remained in class.

I do hope you'll choose to venture along, sharpening your critical tools outside of that venue.  You're poised for major growth, and a rare opportunity has presented itself here and now.  Why not jump in?

All the best, Susan

[Doc. 49-5 at 11 to 49-6 at 1]

Later, on March 29, 2012,  Plaintiff e-mailed the following message to Professor  Dever:  "When can you speak in person or over the telephone, as I've decided what exactly I want to do."  Professor Dever e-mailed back that it would be "Best if I call in a few."   Plaintiff and Professor Dever appear to have had a phone conversation, given the following e-mail Plaintiff sent to Professor Dever later on March 29, 2012:

Susan,

You're too good at what you do.  Thank you some more!

Monica.

 [Doc. 49-5 at 10-11]

April 4, 2012 e-mails from Professor Dever to Plaintiff suggest that Plaintiff and Professor Dever were proceeding with an independent study along

11

the lines proposed by Professor Dever.  [Doc. 49-5 at 10] Plaintiff and Professor

Dever met for their first independent study session on April 5, 2012.  [Doc. 30-5 at

2] During that meeting Plaintiff told Professor Dever that she had changed her

mind and intended to make her *Desert Hearts* paper the subject of her independent

study.  Professor Dever reluctantly agreed.  Professor Dever instructed Plaintiff  to

have a draft revision of Plaintiff's paper on *Desert Hearts* ready on April 10, 2012.

On April 6, 2012, Professor Dever e-mailed Plaintiff to provide some

suggestions for Plaintiff's paper and to propose a plan for the remainder  of the

semester.  [Doc. 49-6 at 6-8] With respect to the topic of language, Professor

Dever suggested "you might try excising adjectives that, as Professor Stone

pointed out, have negative weight and are hard to prove.  'Childless,' for example,

has less of a derogatory tone than 'barren,' a term that has been used historically to

punish and degrade women; 'perverse' is opinion and just muddies another point

the essay seems to be making." Commenting on Plaintiff's decision to revert to a

paper on Desert Hearts, Professor Dever wrote:  "I do think you have chosen the

hardest road in selecting to revise this particular piece, and encourage you, as I did

earlier, to consider moving on to a fresh theme.  Still, if you can capitalize on your

determination and truly use that gumption as a motivator for writing, you may get

some mileage from the effort you've already invested, transforming the essay as a

learning experience.  I'll support your efforts either way, as you know."

On Sunday, April 8, 2012, Plaintiff responded to Professor Dever's April 6,

e-mail:

Susan,

I have a difficult time with so much information in an e-mail.

I am writing on Desert Hearts trying to show that the desert setting is as dry as the film itself & the characters are too.

And I will probably use the word "BARREN" it is my choice; I don't like to be told what words I may and may not use, ever.

What other films should I watch and write on?  Whatever I was to have learned from this class has been skewed by Professor Hinkley's odd behavior.

I wish you would be at the meeting tomorrow with the associate dean, and Ms. Hinkley should be there as well.

I have sought out counseling to try and cope with the stress that this unpleasant experience has added to my life.

Everyone I've mentioned this situation to has been appalled at what has transpired in an academic setting.

Thanks for your continued support.

Monica

[Doc. 49-6 at 6]

On April 9, Professor Dever responded to Plaintiff's April 8 e-mail.  In response to Plaintiff's decision to use the word barren, Professor Dever wrote: "you can make your choices, certainly, but after so much conversation about the word, we know that, as I said in my e-mail and our meeting, your choices have consequences."   Professor Dever ended her e-mail, writing ""Cheers, and looking forward to your e-mailing your paper tomorrow. Susan." [Doc. 49-6 at 4-5]

Later on April 9, 2012 Plaintiff met with Associate Dean Barnet-Sanchez. The meeting did not resolve Plaintiff's issues.

Plaintiff did not turn in her revised paper on April 10, 2012.  Plaintiff did not turn in any further work.

On April 24, 2012, Plaintiff met with William Gilbert, Interim Dean of the College of Fine Arts to discuss Plaintiff's complaint that Professor Hinckley had refused to grade Plaintiff's *Desert Hearts* paper.  The meeting did not resolve any of Plaintiff's issues.

On May 16, 2012, Plaintiff met with Michael Dougher, Vice Provost for Research, and Professors Hinkley and Dever to discuss Plaintiff's complaint that Professor Hinkley had refused to grade Plaintiff's *Desert Hearts* paper.   When asked what she wanted, Plaintiff said that she wanted her tuition refunded.

UNM refunded Plaintiff's tuition for "Images of (Wo)men:  From Icons to Iconoclasts."

**Plaintiff's Claims for Damages are Barred by Qualified Immunity**

In its September 29, 2014  Memorandum Opinion and Order the Court denied Defendants' motion to dismiss, rejecting  Defendants Hinkley and Dever's claim of qualified immunity.  [Doc. 27]   For the reasons given below, the Court revisits that decision.

First, the case now is before the Court on a motion for summary judgment. Most significantly, when the Court entered its September 29, 2014 Memorandum Opinion and Order, the factual evidence proffered in the motion for summary judgment and the

14

response was not before the Court.  The Court  had not yet seen Plaintiff's paper or Professor Hinkley's comments, had not seen the e-mails that Plaintiff and Professor Dever exchanged, and had not read Professor Hinkley and Professor Dever's deposition excerpts. As frequently happens, the account presented by the evidence submitted in support of and in opposition to a motion for summary judgment is considerably more nuanced than the more selective version of events alleged in a complaint.

Second, after the Court entered its September 29, 2014  Memorandum Opinion and Order denying qualified immunity, the Court of Appeals issued its opinion in  *Quinn v. Young*,  780 F.3d  998 (10th Cir. 2015), reversing a decision of this Court denying qualified immunity.  *Quinn* emphasizes the point that a court must not decide the second prong of the qualified immunity analysis at a high level of generality.  780 F.3d at 1005. The Court of Appeals' decision in *Quinn* impelled the Court to reexamine its ruling on qualified immunity in the present case.  In concluding that the law was well-settled, the Court principally relied on the Court of Appeals' decision in *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1285 (10th Cir. 2004).  Although *Axson-Flynn* most certainly clarified the law governing the first amendment rights of university students, it established fairly general principles,[4] and its facts were materially distinguishable[5] from the facts of the present case.  The Court concludes that it erred in its September 29, 2014 Memorandum Opinion and Order by analyzing the second prong of qualified immunity at too high a level of

---

[4]*Axson-Flynn* establishes that viewpoint-based restrictions on student's curricular speech do not violate students' First Amendment right to freedom of speech if the restrictions are reasonably related to legitimate pedagogical concerns.  356 F.3d at 1292.
[5]The free speech claim in *Axson-Flynn* concerned compelled speech to which the plaintiff objected on religious grounds.

generality.  What the Court needs, and what Plaintiff has failed to provide, is a citation to an on-point Tenth Circuit or Supreme Court decision, or an analysis of the weight of authorities from other courts, clearly establishing that the types of restrictions Professor Hinkley and Professor Dever imposed on Plaintiff's *Desert Hearts* paper did not reasonably relate to legitimate pedagogical concerns.  *See Quinn*, 780 F.3d at 1005.  Plaintiff's reliance on *Hansen v. Ann Arbor Public Schools*, 293 F. Supp. 2d 780, (E.D. Mich. 2003), an out-of-circuit district court case,  to make out a case that her First Amendment rights were violated [Doc. 49 at 19-20], is a further indication that the law on which Plaintiff relies was not clearly established in the Tenth Circuit.

The law similarly is unsettled as to the issue of pretext under the facts of this case.  There is evidence that Professor Hinkley was personally offended by Plaintiff's anti-lesbian statements.   But under established Tenth Circuit precedent, the answer to the question "were the restrictions on the student's speech reasonably related to legitimate pedagogical concerns?" determines whether the student's speech "fell within the ambit of First Amendment protection." *See Vanderhurst v. Colo. Mt. Coll. Dist.*, 208 F.3d 908, 914 (10th Cir. 2000).  It is not clear to the Court why, if restrictions on a student's speech, viewed objectively,[6] are reasonably related to legitimate pedagogical concerns, an instructor's subjective hostility to the student's viewpoint should matter, since, under *Vanderhurst*, a determination that the restrictions are reasonably related to legitimate pedagogical concerns takes the student's speech outside "the ambit of First Amendment

---

[6] The *Hazelwood* standard adopted by *Axson-Flynn*—"reasonably related to legitimate pedagogical concerns"— appears to the Court to be an objective standard.

protection."   In the Court's view, Tenth Circuit law is unsettled as to the relationship between a finding that restrictions on student speech are reasonably related to legitimate pedagogical concerns and a finding that instructor harbored subjective hostility to the student's viewpoint.[7]  There is no clear answer as to which finding controls liability under the First Amendment in a *Hazelwood* context.  The Court concludes that the law as it existed in March and April of  2012 would not have provided Professor Hinkley with fair warning that she could be held liable for violating  Plaintiff's First Amendment rights based on her subjective hostility to Plaintiff's homophobic speech even if the restrictions she imposed on Plaintiff's speech were reasonably related to legitimate pedagogical concerns.[8]

The Court concludes that the law governing Plaintiff's First Amendment claims was not clearly established at the times of the events described in the First Amended Complaint.  The Court  therefore will grant Defendants' motion for summary judgment as to Plaintiff's claims for damages against Defendants Caroline Hinkley and Susan Dever.

**Plaintiff  Is Not Entitled to a Declaratory Judgment**

Defendants argue that if Professors Hinkley and Dever are entitled to qualified immunity, the Court should also dismiss Plaintiff's declaratory judgment count. [Doc. 30 at 23] The Court agrees that Count II should be dismissed, but for somewhat different reasons than those proposed by Defendants.

---

[7]This issue also might be viewed as a question of mixed-motive causation. *Cf.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 281-87 (1977) (holding that First Amendment liability does not attach where employer would have taken adverse action  if the employee's protected speech had not occurred).
[8]The Court emphasizes that it is assuming solely for purposes of argument that the law in effect in March and April 2012 if applied to the facts of Plaintiff's case  would have permitted this outcome.

First, Plaintiff requests a declaratory judgment that "Defendants' actions violated Plaintiff's rights secured by the First Amendment to the United States Constitution." [Doc. 11 at 11].   Plaintiff's request for a declaratory judgment addresses conduct that has already  occurred.   A declaratory judgment is not available "simply to proclaim liability for a past act." *Lawrence v. Kuenhold*, 271 Fed. App'x 763, 766 (10th Cir. 2008).

Second, the Board of Regents is an arm of the State of New Mexico, and is immune from suit in federal court under the Eleventh Amendment.  *Barrett v. Univ. of New Mexico Bd. of Regents*, 562 Fed. App'x 692, 694 (10th Cir. 2014).  The Eleventh Amendment bars a federal court from issuing a declaratory judgment that past conduct by a State violated the constitution.  *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993); *Lawrence v. Kuenhold*, 271 Fed. App'x 763, 766 (10th Cir. 2008);  *Int'l Coalition for Religious Freedom*, 3 Fed. App'x 46, 49 (4th Cir. 2001).

**WHEREFORE, IT HEREBY IS ORDERED** that Defendants' Motion for Summary Judgment [Doc. 30] is granted and that the First Amended Complaint and this Action are dismissed with prejudice.

**So ordered this 22nd day of September, 2015.**

_____
M. CHRISTINA ARMIJO
Chief United States District Judge